A97A2354. ASBELL et al. v. BP EXPLORATION & OIL, INC.
(497 SE2d 260)

JOHNSON, Judge.
Elizabeth Asbell, as next of kin and the administratrix of the

estate of James Douglas Hill, Eddie Huntley and Robin Patrice Huntley filed an action against BP Exploration & Oil, Inc. ("BP"), Terrance Lamar Andrews, Marcus Emilio Davis, Gary Deandre Bulger, and John Doe. The Asbell claim pertains to the shooting death of Hill, which occurred at a Northside Drive BP service station on October 24, 1993. The Huntley claims arise from a shooting and injury claim of Eddie Huntley, which occurred at a Headland Drive BP service station on November 30, 1993, and a related loss of consortium claim filed by Robin Huntley. The trial court granted BP's motion for summary judgment, and Asbell and the Huntleys appeal. We affirm.

The record shows that on October 24, 1993, Hill was working at the Northside Drive BP when Andrews, Davis and Bulger (collectively referred to as the "perpetrators") attempted to rob the service station and shot Hill. Hill was employed by Ronald Dean, an independent dealer, who operated the Northside Drive BP service station pursuant to a Dealer Lease and Supply Agreement with BP.

According to Andrews and Bulger, they stopped at the Northside Drive BP to pick up money from Andrews' mother, Linda Fowler, who was employed there. Andrews testified he entered the service station to purchase cigarettes and that he inadvertently pulled his gun from his pocket and it ended up on the counter in front of the cash register. A struggle over the gun ensued, and it discharged, striking and killing Hill. Andrews pled guilty to felony murder, but stated that he did so to help his friends get lesser sentences. Andrews denied that he intended to take money from Hill or commit any crime.

On November 30, 1993, Eddie Huntley was shot by an unknown assailant during an armed robbery while working at a BP convenience store located on Headland Drive. The property and physical building were owned by BP, but operated by Gerald Arienzo pursuant to a Dealer Lease and Supply Agreement.

The complaint alleged that BP owned and participated in operating the Northside Drive and Headland Drive BP locations, that BP breached its duty to keep the premises safe from unlawful acts, that BP breached its duty to keep the premises in proper repair, that BP knew or should have known that its service stations were targets of crime in part due to the design of its shops, that BP failed to provide appropriate security devices, that BP knew or should have known that there had been incidents of criminal activity at and in the area surrounding the Northside Drive and Headland Drive BP locations prior to each of the incidents at issue, and that BP maintained a private nuisance due to the possibility of crime at the Northside Drive and Headland Drive BP locations.

1. In their first two enumerations of error, Asbell and the Huntleys contend the trial court erred in concluding as a matter of law

that BP fully parted with possession of the subject locations, had no right to control the operations of the subject locations, and did not participate in the time, method and/or manner of operations at the subject locations. We disagree.

Contrary to Asbell's allegation that BP participated in the operations at the Northside Drive BP, the evidence established that the Northside Drive BP was at all times operated by Dean pursuant to the Dealer Lease and Supply Agreement between BP and Dean. Dean was at the time of this incident, and still is, an independent dealer and the CEO of Northside Gulf, Inc. Northside Gulf, Inc. operates the Northside Drive BP. Dean's company has operated the 24-hour service station at Northside Drive since about 1977. Prior to entering into the agreement with BP in 1989, Dean operated under a lease agreement with Gulf Oil.

BP owns the property at the Northside Drive location and leases the premises to Dean. Dean testified as follows: "I operate any way I want, per se, as long as it's good business practices. In other words, I'm relatively free to conduct business as the business goes. It's a service station, service bay work, convenience store, so there [are] really no restrictions." Dean controls the operation of the Northside BP station according to his desires within the purview of the dealer agreement. Although he is required to sell BP gasoline, he can sell any brand of tires, batteries and accessories. He institutes his own policies, such as restricting the presence of family members during work hours. He also installed video cameras in the service station, without the knowledge or participation of BP, so he could monitor store activity.

The Headland Drive BP facility was owned and operated by BP until BP and Arienzo signed the Dealer Lease and Supply Agreement in 1992. Arienzo testified that the only product he is required to purchase from BP as part of the Dealer Lease and Supply Agreement is gasoline; Arienzo purchases oil and other products for retail sale from other suppliers. Arienzo is allowed to set his own prices and is only asked to be competitive. In addition, while the Dealer Lease and Supply Agreement specifies that the convenience store should be open twenty-four hours each day, seven days a week, Arienzo testified that eighteen hours is sufficient.

The Dealer Lease and Supply Agreements, which are essentially identical for these two facilities, provide, "[i]t is mutually agreed that the business conducted by Dealer at the Facility is the independent business of Dealer, and this Agreement shall not be construed as reserving to or conferring upon BP any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business."

The Dealer Lease and Supply Agreements at issue do not sup-

port a finding that BP controlled the dealers' time, method, or manner of operations, but merely set forth the terms and conditions under which the dealers were permitted to operate a facility using the name "BP." The rules and regulations within the Dealer Lease and Supply Agreements simply impose various building, construction and/or operational requirements as a means of permitting BP to achieve a certain level of quality and uniformity within its system. See *Anderson v. Turton Dev.*, 225 Ga. App. 270, 273 (2) (483 SE2d 597) (1997). BP can require results in conformity with the dealer agreements without creating an agency relationship. See *Holiday Inns v. Newton*, 157 Ga. App. 436, 437 (278 SE2d 85) (1981).

Moreover, as with the use of distinctive colors and trademark signs, the requirement that a dealer's employees wear uniforms which display a company logo or emblem does not evidence control by BP, but represents no more than notice that BP's products are being marketed at the station. See *Texaco v. Youngbey*, 211 Ga. App. 789 (440 SE2d 533) (1994). The trial court did not err in concluding that BP did not reserve the right to, or act to, control the day-to-day operations at either BP location under the Dealer Lease and Supply Agreements and that the plaintiffs failed to provide any evidence to support their arguments that BP controlled the time, method or manner of operations at either BP location. See generally *McMullan v. Georgia Girl Fashions*, 180 Ga. App. 228, 229 (2) (348 SE2d 748) (1986); *Manis v. Gulf Oil Corp.*, 124 Ga. App. 638 (185 SE2d 589) (1971).

Since BP had fully parted with possession and control of the property to the dealers, its duties are limited to those imposed under OCGA § 44-7-14. See generally *Plott v. Cloer,* 219 Ga. App. 130, 131 (1) (464 SE2d 39) (1995). Pursuant to this statute, BP only owed a duty to ensure that the leased premises were properly constructed and maintained. Id. These issues are addressed below in separate enumerations.

2. Asbell and the Huntleys contend that the trial court erred in concluding as a matter of law that BP contractually delegated its duties of repair and maintenance to the BP dealers at the Northside Drive and Headland Drive facilities. We disagree.

With respect to maintenance at company-owned, dealer-operated facilities such as the Northside Drive and Headland Drive BP facilities, BP provided specified and limited items of maintenance. The dealer agreements provide that "Dealer further agrees at Dealer's own cost and expense to maintain the Facility and BP's equipment in accordance with the Maintenance Schedule attached as Exhibit E." According to the dealer agreements, BP is responsible for maintaining the gallon or dollar totalizers on the fuel dispensing equipment after being informed by the dealer that maintenance was

required. BP is also responsible for major repairs or modifications, in its discretion. The maintenance schedules provide the frequency of maintenance to be performed by the dealer and BP. Pursuant to the maintenance schedules, the dealer performs all daily and weekly inspections necessary to maintain the air compressor, lifts, pumps, tanks, heating and cooling, building, yard and exterior lighting. BP provides maintenance when notified by the dealer or as scheduled.

According to the Dealer Lease and Supply Agreements, the dealers were obligated to "[p]rovide a safe place to work for [his] employees, and maintain and operate the Facility in compliance with all applicable laws, regulations and rules concerning safety of the work place." This provision reinforces BP's contention that the duty of maintaining the premises in a safe condition is on the dealers. See *Ragsdale v. Harris*, 162 Ga. App. 888, 890 (293 SE2d 475) (1982).

The only allegation raised on the issue of failure to repair at the Headland Drive BP facility concerns the sufficiency of the exterior lighting. However, this claim fails since the Huntleys produced no evidence that inadequate lighting caused or contributed to Eddie Huntley's shooting. See *Jones v. Campbell*, 198 Ga. App. 83, 85 (2) (400 SE2d 364) (1990); *Brown v. RFC Mgmt.*, 189 Ga. App. 603, 605 (376 SE2d 691) (1988). In fact, Eddie Huntley testified that on the evening of the shooting, he saw a black male walking outside the facility and that he believed the man was suspicious because of the way the man was dressed. In addition, testimony established that the Headland Drive facility has a canopy which contains thirty-two lights, each having four hundred watts, and that the absence of four canopy lights and one yard/security light, located over one of the street driveway entrances, would have little effect on the adequacy of the exterior lighting.

3. There is no evidence in the record to support Asbell's and the Huntleys' allegations that the Northside Drive and Headland Drive BP stations were improperly constructed. According to their brief, there should have been fencing, protective barriers, and additional lighting and locks at the BP facilities. However, there is no evidence that a different building design would have prevented or decreased the likelihood of the criminal attack by the perpetrators.

With respect to fencing, the appellants' expert faulted BP for not installing perimeter fencing around its retail locations, yet admitted he did not check to see whether such fencing would have violated the local building code and/or zoning requirements. Asbell and the Huntleys also failed to establish how the installation of perimeter fencing would have prevented the shootings at these BP facilities.

Asbell and the Huntleys further failed to establish that the absence of a bullet-resistant partition around the cashier's counter constituted negligent construction. The appellants' expert testified

that he is not aware of any data showing that protective barriers prevent or reduce crime in any way. This expert further testified that while working as a security consultant for other convenience store chains, he could not recall ever recommending the installation of bullet-resistant glass partitions and admitted that he was not aware of any industry standard regarding the installation or use of bullet-resistant glass partitions in convenience stores.

No evidence in the record indicates that the installation of a bullet-resistant partition constitutes an industry standard in the gasoline station/convenience store business. In fact, both Wayne Meding, who works with Chevron, and John Manelos, who works with Amoco, testified that their respective companies install bullet-resistant partitions in company-operated locations, but did not have a company policy regarding the installation of this type of partition in dealer-operated locations.

As for additional lighting and locks, the appellants' expert admitted that lighting at the Northside Drive BP was not an issue. The Northside Drive BP also had a pass-through window, and Dean instructed his employees to keep the front door locked after 10:00 p.m. Furthermore, as stated in Division 2, the Huntleys' claim regarding the sufficiency of the lighting lacked merit because they failed to show how any such insufficiency caused or contributed to Eddie Huntley's injury.

4. Even if BP retained some right to control the Northside Drive facility so that liability would be predicated on OCGA § 51-3-1, BP still is not liable for Hill's murder because the robbery and murder of Hill at the Northside location were not foreseeable to BP. According to Dean, the Northside service station is located in a low crime area. Dean testified that he did not think robbery was a foreseeable event at the Northside Drive station and that there had been only two incidents at the service station in the 17-18 years that he operated the facility. While one of Dean's employees was robbed in the early 1980s, the station was owned by Gulf Oil at the time of that incident. In addition, while another employee testified that he heard Hill may have been the victim of an earlier robbery, no evidence was presented regarding if and when this incident occurred. The evidence shows that BP was not and is not aware of any similar criminal activity that may have occurred at the Northside BP prior to Hill's robbery and murder. BP did not monitor its dealer-operated service stations for criminal activity and did not require Dean to report criminal incidents to BP. BP did not have a duty to investigate police files to determine whether criminal activities had occurred on the premises. See *Sun Trust Banks v. Killebrew*, 266 Ga. 109 (464 SE2d 207) (1995).

Asbell relies on the testimony of a security expert to support her

contention that Hill's death was foreseeable because convenience stores were targets for crime and because the Northside location was located in a high crime area. However, the security expert testified that he did not have any statistical data to support his conclusion that the Northside Drive BP was located in a high crime area. He also acknowledged that he was not aware of any statistical data showing that glass enclosures reduced the risk of crime and contended the use of these devices depended on factors such as the conditions and circumstances involved in a given location or area. He also had no opinion as to whether the use of glass enclosures was standard in the industry and no opinion as to what the trend was as far as the frequency of robberies at convenience stores.

Furthermore, while Asbell argues that this incident was foreseeable because the day after Hill was murdered, bullet-resistant glass was installed at the Northside Drive BP, the evidence shows that Dean made the decision to install this glass and paid for its installation. BP had no involvement in the purchase or installation of the glass at the facility.

The trial court did not err in concluding that the criminal attack on Hill was not foreseeable to BP.

5. Asbell and the Huntleys further contend that the trial court erred in concluding as a matter of law that BP is not liable because, according to the appellants, BP had specific knowledge of the danger of robbery, undertook to provide security, and provided inadequate security.

The evidence does not show that BP had specific knowledge of the danger of robbery at the Northside Drive and Headland Drive BP locations. Asbell and the Huntleys contend the Metro Armed Robbery Squad ("MARS") and the Southeastern Petroleum Association ("SEPA") were formed as a result of the high incidence of crime at convenience stores, and that these associations provided knowledge to BP of the danger of robbery. However, the appellants' statements in their brief are inaccurate. MARS was formed in 1991 by the FBI because of a high incidence of bank robberies in Atlanta. When a source of funding became needed, MARS approached petroleum companies because "[t]hey have money and they're big companies," not because of an unusually high crime rate at convenience stores. Likewise, SEPA was formed to provide an agency for funding MARS and to provide a liaison agency for security issues for petroleum companies operating in the Southeastern United States. An FBI agent used a bank robbery chart when he made his presentation to SEPA and was trying to convince SEPA to support MARS.

As stated in Division 4, there was no evidence that the robbery and murder at the Northside Drive station were foreseeable to BP. As for the Headland Drive station, a Vulnerability Analysis Site Report

performed in November 1990, when this location was company-operated, indicated that the crime rate in the area was "moderately low." Contrary to the appellants' allegations, there is no evidence that Arienzo was informed by BP that the general area would be difficult to operate in because of crime; he was told it would be "[t]ough from a standpoint of profit."

The Dealer Lease and Supply Agreements specifically state that the dealers are required to "[p]rovide a safe place to work for [his] employees, and maintain and operate the Facility in compliance with all applicable laws, regulations and rules concerning safety of the work place. Dealer shall provide all employees with adequate training concerning workplace safety and safe work practices. . . . Dealer acknowledges that safety of the workplace is Dealer's responsibility and not BP's."

BP provided limited security assistance to company-owned, dealer-operated locations such as those at Northside Drive and Headland Drive. For example, BP provided pre-employment screening for a fee, assistance with credit card fraud investigation, a reward program for information leading to arrests and convictions, and the installation of pass-through cash windows at some locations. For these types of facilities, BP did not administer company guidelines regarding security, did not perform security vulnerability assessments, and did not perform any security upgrades. BP neither employed security personnel nor represented that it provided security of any type. Hill's and Eddie Huntley's injuries were the result of the independent, criminal conduct of third persons which occurred on premises over which the dealers had complete control. See *Plott*, supra. While BP's Security Department provides assistance to dealer operations upon request, the dealer agreements make it clear that BP does not undertake a duty to provide a safe and secure workplace.

Dean testified that he installed three video cameras in 1992 when he converted the Northside Drive BP facility to a convenience store. These cameras were paid for by Dean and installed by a company hired by Dean, without the knowledge or assistance of BP.

According to Arienzo, BP gave him the option of purchasing the security system it had in place at the Headland Drive facility when he signed the Dealer Lease and Supply Agreement, but Arienzo thought it was too costly and replaced BP's system with his own security system. Subsequently, Arienzo asked BP to install protective glass near the cash register, but was told that BP's policy was that dealers could install the glass at their own expense after submitting remodeling plans to BP for approval. Although a BP representative told Arienzo it was against BP policy, Arienzo kept a gun under the store counter.

BP did not maintain control over the Northside Drive and Head-

land Drive facilities so as to require it to keep the premises and approaches safe pursuant to OCGA § 51-3-1. Moreover, BP did not assume that responsibility, but specifically stated in the dealer leases that it was the dealer's responsibility to provide a safe and secure workplace. According to the record, both dealers assumed that responsibility. Although the appellants' expert sets out additional security measures that were available, such as those discussed in Division 3, it was not BP's responsibility or decision to implement them · at dealer locations such as Northside Drive and Headland Drive. This enumeration lacks merit.

6. Asbell and the Huntleys maintain that BP was a concurrent proximate cause with co-defendants Andrews, Davis and Bulger for the robbery of Eddie Huntley and murder of Hill because BP did not keep the Headland Drive and Northside Drive stations safe or did not properly construct and repair the stations. Since we previously determined that BP did not owe any duty to provide a safe workplace, and since we previously determined that BP did not breach its duty to properly construct and repair the Northside Drive and Headland Drive facilities, this enumeration of error lacks merit.

7. The trial court did not err in concluding as a matter of law that it did not need to rule on the appellants' claim for nuisance (OCGA § 41-1-1) because BP had fully parted with possession of the BP locations. Without an agency relationship, BP cannot be found responsible for the creation and/or existence of any alleged private nuisance. See generally *Colquitt v. Rowland*, 265 Ga. 905, 906-907 (1), (2) (463 SE2d 491) (1995); *Howell Gas of Athens v. Coile*, 112 Ga. App. 732, 737 (1) (146 SE2d 145) (1965).

*Judgment affirmed. Pope, P. J., and Blackburn, J., concur.*

DECIDED FEBRUARY 9, 1998 —
RECONSIDERATION DENIED FEBRUARY 23, 1998

*Bauer & Deitch, Gilbert H. Deitch*, for appellants.
*Webb, Carlock, Copeland, Semler & Stair, Wayne D. McGrew III, Adam L. Appel, McLain & Merritt, William S. Sutton*, for appellee.