## A01A1207, A01A1208. BP EXPLORATION & OIL, INC. v. JONES; and vice versa.
### (558 SE2d 398)

RUFFIN, Judge.

Ulrica Jones sued BP Exploration & Oil, Inc. ("BP") for personal injuries she allegedly sustained at a BP-branded gasoline station in Byron. BP moved for summary judgment, which the trial court granted in part and denied in part. In Case No. A01A1207, BP appeals from the trial court's partial denial of its motion for summary judgment.[1] Jones cross-appeals in Case No. A01A1208, enumerating as error the trial court's partial grant of summary judgment to BP. For reasons that follow, we affirm the grant of summary judgment in Case No. A01A1208 and reverse the denial of summary judgment in Case No. A01A1207.

On appeal, we review the grant or denial of a motion for summary judgment de novo, construing the evidence and all reasonable inferences in favor of the nonmovant.[2] Construed in this light, the record shows that, on November 14, 1997, Jones visited the BP gasoline station in Byron for tire service. An employee serviced the tire, and as Jones prepared to leave, Brandon Huff, another station employee, drove a large tow truck rapidly toward her car. After stopping the truck "very close" to Jones' car, Huff called Jones a profane name and told her to move. Jones then followed Huff into the station office, asked why he had spoken to her in that manner, and requested the name of his manager. Huff refused to give his manager's name, and, as the confrontation escalated, Huff pushed Jones through a plate glass window.

At the time of this incident, Brandon Huff's father, Michael Huff, owned and operated the Byron BP through his corporation, Huff Enterprises, Inc. The Byron BP received its gasoline from Beckham Brothers Distributors ("Beckham"), a BP distributor that held a franchise agreement with BP.

Jones subsequently sued BP, Huff Enterprises, Brandon Huff, and Michael Huff for injuries she allegedly sustained during her confrontation with Brandon Huff. BP moved for summary judgment, and the trial court granted the motion as to Jones' vicarious liability claims involving actual agency, apparent agency, joint venture, and respondeat superior. It denied, however, BP's request for summary judgment on Jones' direct negligence and punitive damages claims.

---

[1] We granted BP's application for interlocutory appeal on March 30, 2001.

[2] *Sudler v. Campbell*, 250 Ga. App. 537, 538 (1) (550 SE2d 711) (2001).

*Case No. A01A1208*[3]

1. Jones argues that the trial court erred in granting BP summary judgment on her actual agency, apparent agency, and joint venture claims. We find no error.

(a) *Actual agency*. To support her actual agency claim, Jones must show that BP retained the right to control the "time, manner and method of" the Byron BP's operations.[4] As evidence of BP's control, Jones cites primarily to BP's Service Station Standards Manual.

Beckham's franchise agreement with BP authorized Beckham to purchase BP products and resell those products to specific, independently owned stations, including the Byron BP. The agreement also gave Beckham a license to use the BP trademark and sublicense that trademark to gasoline stations approved by BP, "to the extent that such [stations] agree[d] to be bound by the terms and conditions of" the Beckham/BP agreement. Under the agreement, all stations supplied by Beckham were required to conform to BP's Service Station Standards Manual. That manual established standards for things such as service station signs, use of the BP logo, graphics on the buildings, interior shop decor, lighting design, promotional displays, billboards, employee uniforms and personal appearance, and station cleanliness. Stations failing to conform to these standards could be debranded.

Although Jones argues broadly that the standards manual dictated the Byron BP's day-to-day operations, the only daily operations she discusses involve the station's appearance and cleanliness. She notes that the manual set standards for "what cleaners to use, when floors should be mopped and when products should be turned."[5] We have consistently held, however, that such standards do not constitute the type of control necessary to support a finding of actual agency. Rather, they are "a means of permitting BP to achieve a certain level of quality and uniformity within its system" and merely set forth the conditions under which gasoline stations, such as the Byron BP, can use the BP brand name.[6] Similarly, neither the occasional

---

[3] For ease of discussion, we will address the two cases on appeal in reverse order.

[4] *Manis v. Gulf Oil Corp.*, 124 Ga. App. 638, 639 (185 SE2d 589) (1971). See also *Asbell v. BP Exploration & Oil*, 230 Ga. App. 700, 703 (1) (497 SE2d 260) (1998).

[5] (Emphasis omitted.)

[6] *Asbell*, supra. See also *Wells v. Vi-Mac, Inc.*, 226 Ga. App. 261 (1) (486 SE2d 400) (1997) ("[The claimants'] assertion that Vi-Mac exercised a high degree of control over Miller's business is not borne out by the record, which shows that Vi-Mac could require Miller to sell only Texaco products and comply with Texaco standards for cleanliness and appearance, but could not otherwise control Miller's hours or manner of operation."); *Anderson v. Turton Dev.*, 225 Ga. App. 270, 274 (2) (a) (483 SE2d 597) (1997) (rules in hotel franchise agreement imposing various building, construction, and operational requirements did not permit the franchisor to control the daily operations of the franchise; they were sim-

station visits by BP personnel to verify conformity with these standards nor BP's power to debrand a station for not conforming creates an agency relationship.[7]

Thus, clear Georgia case law undermines Jones' argument that the standards manual evidences the control necessary for actual agency. We recognize that these cases often involve parties with a franchisor-franchisee relationship or a written supplier agreement.[8] Citing that fact, Jones argues that this authority does not apply here because, in her view, the Byron BP had no franchise or other contractual relationship with BP. Regardless of whether the Byron station had any contractual agreement with BP, however, the control test governing actual agency is the same. And under that test, BP's cleanliness and appearance standards do not raise a question of fact as to actual agency.

Furthermore, Michael Huff, owner of the Byron BP, testified that he never received a copy of the service manual or Beckham's agreement with BP, which references the manual. He also denied any significant contact with BP, asserting that he dealt instead with Beckham. Indeed, as Jones asserts on appeal, BP had no contractual relationship with the Byron BP. According to Huff, he and his station manager set the rules and policies at the Byron BP station. BP did not control employee hiring, firing, or training, and BP did not set the Byron BP's hours of operation.

The record lacks any evidence that BP reserved a right to control the time, manner, and method of the Byron BP's operations. The trial court, therefore, properly granted BP summary judgment on the actual agency claim.

(b) *Apparent agency.* We also find no question of fact as to Jones' apparent agency claim. To recover under this theory, Jones must show (1) that BP held the Byron BP out as its agent; (2) that she justifiably relied on the care or skill of the Byron BP based on BP's alleged representation; and (3) that this justifiable reliance led to the injury.[9]

Jones asserts that BP held the Byron BP out as its agent

---

ply "'a means of achieving a certain level of quality and uniformity within [the franchise] system'"); *McGuire v. Radisson Hotels Intl.*, 209 Ga. App. 740, 742 (1) (435 SE2d 51) (1993) (physical precedent only) (same).

[7] See *Pizza K v. Santagata*, 249 Ga. App. 36, 39 (547 SE2d 405) (2001) ("[R]eserving the right to inspect or evaluate a franchisee's compliance with the franchisor's 'standards and to terminate the franchise for noncompliance is not the equivalent of retaining day-to-day supervisory control of the franchisee's business operations as a matter of law.'"); *Anderson*, supra (no agency relationship created by hotel franchisor's right to inspect the hotel); *McGuire*, supra at 742-743 (same).

[8] See *Pizza K*, supra at 36; *Asbell*, supra at 702; *Wells*, supra at 261; *Anderson*, supra at 270; *McGuire*, supra at 740-741.

[9] See *Butkus v. Putting Greens Intl. Corp.*, 222 Ga. App. 661, 663 (475 SE2d 693) (1996).

through its national advertising campaign, which, she claims, "represented to the public that all BP stations were its own." BP's advertising campaign revolved around the slogan "BP, we keep you moving." According to a BP representative, BP used this slogan "to position [itself] as a brand that could be differentiated as a quick, fast experience for our customers with high-quality gasolines." Other advertising tag lines included "we keep people moving with pay at the pump and our fast BP shops" and "we at BP will continue to provide lots of convenient locations."

An apparent agency does not arise simply because an independent gasoline station displays a national oil company's trademark.[10] As we have held,

> [i]t is indeed a matter of common knowledge and practice that distinctive colors and trademark signs are displayed at gasoline stations by independent dealers of petroleum product suppliers. These signs and emblems represent no more than notice to the motorists that a given company's products are being marketed at the station.[11]

Similarly, a national oil company's advertising campaign to "solicit the public's trust and confidence in its affiliates" does not necessarily render the oil company liable for injuries at an independently operated gasoline station.[12] In short, the company does not open itself to liability merely by advertising its brand.

Certainly, the wording of an advertisement *can* create an apparent agency. In *Watson v. Howard Johnson Franchise Systems,*[13] for example, billboards for the HoJo Inn, an independently owned and operated Howard Johnson franchise, described the hotel as "HoJo Inn *by* Howard Johnson."[14] The evidence showed that Howard Johnson knew about that slogan, which raised a factual issue as to whether Howard Johnson held the HoJo Inn out as its own. The *Watson* decision, however, does not demand reversal in this case.

We note initially that *Watson* involved local billboards relating to a specific hotel. In contrast, a national advertising campaign is at issue here. Jones argues that by using the pronouns "we" and "our" in its advertising, BP represented to the public that all BP service stations fell under BP's control. We disagree. Under Georgia law, it is

---

[10] See *Texaco, Inc. v. Youngbey*, 211 Ga. App. 789, 790 (440 SE2d 533) (1994); *Manis*, supra at 639-640.

[11] (Punctuation omitted.) Id.

[12] *Ragsdale v. Harris*, 162 Ga. App. 888, 889 (293 SE2d 475) (1982). See also *Pitts v. Ivester*, 171 Ga. App. 312, 314-315 (2) (320 SE2d 226) (1984).

[13] 216 Ga. App. 237 (453 SE2d 758) (1995).

[14] (Emphasis supplied.) Id. at 238.

common knowledge that independent gasoline stations use the trademarks, emblems, and colors of national oil companies, such as BP.[15] Given the public's knowledge of independent dealerships, we cannot find that BP held all BP stations out as its agents by using "we" and "our" in its national advertising. We also find no evidence of apparent agency in BP's effort to assure the public that all BP stations offer fast, top quality service. Again, the public knows that independent dealers use the BP trademark and offer BP products. The advertisements cited by Jones do not undermine that common knowledge or represent that every BP-branded gasoline station comes within BP's control.[16] Under these circumstances, BP's advertising campaign did not create an apparent agency as to its branded stations.

Furthermore, Jones has not pointed to any evidence that BP specifically held out the Byron BP as its agent. She has cited no advertisements that reference the Byron BP, and the Byron BP's use of BP colors and emblems does not support her apparent agency theory.[17] Jones asserts that the Byron BP failed, with BP's knowledge, to post a sign indicating that it was an independently owned and operated station. Standing alone, however, failure to post such a sign does not permit an apparent agency finding.[18] Accordingly, the trial court did not err in granting BP summary judgment on Jones' apparent agency claim.

(c) *Joint venture.* Jones also argues that BP, Beckham, and the Byron BP entered into a joint venture, rendering BP liable for negligence attributable to the Byron BP. A joint venture arises " 'when there exist rights of mutual control as to the conduct of the various members of the enterprise.' "[19] Mere business interdependency does not create a joint venture.[20]

In *Wells v. Vi-Mac, Inc.,*[21] we rejected a joint venture argument analogous to that raised by Jones. There, a claimant injured at an independently owned Texaco station sued the company that supplied the gasoline and leased the station's property and equipment to the station owner. We found that, although the company required the station owner to sell Texaco products and comply with Texaco's cleanliness standards, it had no right to control the station's manner of

---

[15] See *Youngbey*, supra; *Manis*, supra.

[16] Cf. *Watson*, supra.

[17] See *Youngbey*, supra; *Manis*, supra.

[18] See *Anderson*, supra at 275. Cf. *Watson*, supra (Howard Johnson's knowledge that HoJo Inn failed to post independent hotel sign, combined with "HoJo Inn by Howard Johnson" advertisement, created a factual issue regarding apparent agency).

[19] *Pope v. Goodgame*, 223 Ga. App. 672, 674 (2) (c) (478 SE2d 636) (1996).

[20] Id.

[21] Supra at 261-262.

operation.[22] Thus, because the company and the station owner "did not have mutual rights of control, there was no joint venture."[23]

A similar lack of mutual control exists here. As found in Division 1 (a), BP reserved no right to control the time, manner, and method of the Byron BP's operations. In short, it did not have " 'mutual control as to the conduct of' " the Byron BP.[24] Accordingly, the trial court properly granted BP summary judgment on Jones' joint venture allegations.[25]

## Case No. A01A1207

In its appeal, BP argues that the trial court erred in denying its motion for summary judgment on Jones' direct negligence and punitive damages claims. We agree.

2. Jones' direct negligence claim arises under Restatement (Second) of Torts, § 324A. Under that section, which has been adopted in Georgia,[26]

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.[27]

Jones argues that BP gratuitously undertook a duty to receive, handle, and resolve customer complaints at its branded stations, including those operated by independent dealers. The evidence reveals that BP accepted customer complaints through a toll-free telephone number, as well as through written correspondence and electronic mail. The evidence further shows that numerous consumers lodged complaints with BP regarding the Byron BP, alleging that the station and its employees overcharged, defrauded, and threatened customers. Based on this evidence, the trial court concluded that BP undertook a duty to receive and respond to customer

---

[22] Id. at 261.

[23] Id. at 262 (1).

[24] *Goodgame*, supra.

[25] See id.; *Wells*, supra.

[26] *Huggins v. Aetna Cas. &c. Co.*, 245 Ga. 248, 249 (264 SE2d 191) (1980).

[27] Restatement (Second) of Torts, § 324A.

complaints. It further found that a question of fact remained as to whether BP acted negligently in handling these complaints.

On appeal, BP argues that it never undertook a duty to resolve the complaints about the Byron BP, which it forwarded to Beckham for handling and resolution. Even assuming that BP undertook this duty, however, we agree with BP that Jones cannot sustain a cause of action under § 324A.

(a) Pursuant to § 324A (a), BP may be liable to a third party for negligently performing a duty undertaken to protect the third party or the third party's things *if* BP's negligence increased the risk of harm.[28] This subparagraph applies " 'when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed.' "[29] The negligence must "expose[ ] the injured person to a greater risk of harm than had existed previously."[30]

Jones claims that the Byron BP station had a serious customer service problem that presented a hazard to customers. BP obviously did not create this alleged hazard; it arose from the station's activities. Nevertheless, Jones asserts that the station became a greater risk to the public with each complaint that BP failed to investigate and address. In her view, BP's failure to respond reasonably to the customer complaints *increased* the risk produced by the alleged hazard.

Without dispute, BP did not eliminate the customer service problem at the Byron BP. Liability, however, does not attach for failing to decrease the risk of harm. Instead, § 324A (a) applies when the alleged negligence *increases* the risk. We cannot simply assume that BP's alleged failure to respond to complaints increased the risk to customers, and Jones has pointed to no evidence that the risk escalated. At most, the evidence shows that BP allowed the hazard to continue, conduct that does not support liability under this subparagraph.[31]

(b) To be liable under § 324A (b), BP must have undertaken a duty owed by another party to Jones. BP's agreement with Beckham required Beckham to develop "customer responsiveness programs

---

[28] See Restatement (Second) of Torts, § 324A (a).

[29] *Adler's Package Shop v. Parker*, 190 Ga. App. 68, 71 (1) (b) (378 SE2d 323) (1989).

[30] *Huggins v. Standard Fire Ins. Co.*, 166 Ga. App. 441, 442 (304 SE2d 397) (1983).

[31] See id.; *Adler's Package Shop*, supra. See also *Howell v. United States*, 932 F2d 915, 917-919 (11th Cir. 1991) (under Georgia law, FAA inspector's failure to ground plane with known fuel contamination problem or to take other action to prevent plane from flying did not increase risk that fuel problem would later cause plane to crash); *Smallwood v. United States*, 988 FSupp. 1479, 1481-1482 (1) (a) (i) (S.D. Ga. 1997) (OSHA's alleged failure to inspect for dangerous conditions at plant did not increase risk that claimant would step into unguarded vat of molten metal; "[i]ndeed, if the vats were hazardous, they were hazardous prior to the inspections").

designed to respond to and resolve customer inquiries or complaints . . . received directly by [Beckham], and to those received by [BP] and referred to [Beckham] for response." Based on this evidence, Jones argues that Beckham originally owed customers a duty to respond to and resolve customer complaints. She further claims that BP gratuitously took this duty over from Beckham, thus meeting the requirements of subparagraph (b).

Subparagraph (b) only applies, however, "to those situations where the alleged tortfeasor's performance is to be substituted *completely* for that of the party on whose behalf the undertaking is carried out."[32] Nothing in the record indicates that BP entirely took over the duty of responding to and resolving customer complaints. In fact, the evidence shows that when BP received complaints involving the Byron BP, it generally forwarded those complaints to Beckham with instructions to "please handle." Furthermore, Michael Huff testified that he worked directly with Beckham in resolving any customer complaints that he received from Beckham. According to Huff, the Beckham representative would tell him, "[h]ere's a complaint; give me an answer to it or settle it and I'll be back next week and we'll settle it."

Beckham's agreement with BP required Beckham to resolve customer complaints at the Byron BP. Although BP may have become involved with those complaints, the evidence shows that it did not *completely* take over the responsibility originally delegated to Beckham. BP kept Beckham in the complaint resolution process. Accordingly, BP's liability cannot rest on § 324A (b).[33]

(c) The final basis for liability under § 324A — reliance — similarly does not support Jones' claim. Section 324A (c) "requires proof of actual reliance by either [Jones] or [Beckham] on [BP's] undertaking."[34]

As noted above, BP allegedly undertook the duty to resolve and respond to customer complaints. Jones has pointed to no evidence that she actually relied on this undertaking. According to Jones, she

---

[32] (Emphasis supplied.) *Huggins v. Standard Fire Ins. Co.*, supra. See also *Hutcherson v. Progressive Corp.*, 984 F2d 1152, 1156 (11th Cir. 1993) (citing *Huggins v. Standard Fire Ins. Co.*).

[33] See *Huggins v. Standard Fire Ins. Co.*, supra. Cf. *Blossman Gas Co. v. Williams*, 189 Ga. App. 195, 198 (1) (375 SE2d 117) (1988) (physical precedent only) (where retailer volunteers to inform its customers of a product recall by mailing recall notices supplied by manufacturer, and thus takes over duty originally falling on manufacturer, it must carry out this voluntarily assumed task with ordinary care, and its failure to do so may result in liability under § 324A (b)).

[34] *Huggins v. Standard Fire Ins. Co.*, supra. See also *Argonaut Ins Co. v. Clark*, 154 Ga. App. 183, 186 (2) (267 SE2d 797) (1980) ("Potential liability arises under subparagraph (c) if 'the harm is suffered because of the reliance of the other or the third person upon the undertaking.'").

visited the Byron BP on November 14, 1997, because she knew from her own experience and from advertisements that BP offered "top quality service." That testimony, however, does not create a question of fact as to Jones' reliance in this case. Her belief in the quality of BP's service is irrelevant to whether she relied on BP's alleged undertaking to respond to and resolve customer complaints. Indeed, Jones has not cited any evidence that she knew about BP's customer complaint process before November 14, 1997. We thus find that no factual question remains as to Jones' reliance on the claimed undertaking.[35]

Factual issues are similarly absent with respect to Beckham's reliance. Jones argues that "Beckham Brothers relied on BP to obtain and handle complaints." Yet, the evidence, including Michael Huff's testimony, shows that Beckham remained heavily involved in complaint resolution at the Byron BP. Furthermore, Jones has pointed to no evidence that Beckham relaxed or altered its own complaint procedures in reliance on BP's alleged undertaking.[36] The record lacks evidence that Beckham relied on this purported undertaking to Jones' detriment.[37] Accordingly, the trial court erred in failing to grant BP summary judgment on Jones' claim under § 324A (c).

3. As found in Divisions 1 and 2, BP was entitled to summary judgment on each of Jones' substantive claims. The trial court, therefore, erred in failing to award BP summary judgment on Jones' request for punitive damages.

*Judgment reversed in Case No. A01A1207. Judgment affirmed in Case No. A01A1208. Johnson, P. J., concurs. Ellington, J., concurs in the judgment only.*

---

[35] See *Universal Underwriters Ins. Co. v. Smith*, 253 Ga. 588, 591 (322 SE2d 269) (1984) ("We conclude that use by a third person of a defective instrumentality . . . in the manner in which such instrumentality is customarily used, *where the fact of inspection is known to the third person* but the defect is unknown, demonstrates reliance by the third person upon the defendant's safety inspection of the defective instrumentality.") (emphasis supplied); *Howell*, supra at 919 (III) ("Georgia law, at a minimum, requires knowledge that the allegedly negligent inspection occurred before reliance can be found and 'good samaritan' liability can attach.").

[36] See *Tillman v. Travelers Indem. Co.*, 506 F2d 917, 921 (II) (5th Cir. 1975) (cited with approval in *Argonaut Ins. Co.*, supra at 187) (insurance company that agrees to inspect for safety hazards may be liable to injured employee if the employer "so relied on the insurer's undertaking that it neglected its own safety inspection program to . . . (the employee's) detriment"); Restatement (Second) of Torts, § 324A, comment e ("Where the reliance of the other, or of the third person, *has induced him to forgo other remedies or precautions* against such a risk, the harm results from the negligence as fully as if the actor had created the risk.") (emphasis supplied).

[37] See *Adler's Package Shop*, supra at 71-72; *Tillman*, supra.

Decided November 15, 2001 —
Reconsideration denied December 7, 2001 — 

*Alston & Bird, Gerald L. Mize, Jr., George N. Mori, Douglas G. Scribner, Paul J. Kaplan,* for appellant.

*Gregory, Christy & Maniklal, Hardy Gregory, Jr., Gary C. Christy, Preyesh K. Maniklal, Christopher N. Smith,* for appellee.