## A03A0812. DAVIS COMPANY, INC. et al. v. DEPARTMENT OF TRANSPORTATION.
(584 SE2d 705)

ADAMS, Judge.

The Department of Transportation condemned two parcels of property on which a service station and small store were operated by a lessee. Both the property owner and the lessee-business operator argued below that they were entitled to business loss damages in addition to property loss damages. And both the owner and lessee argued that they should be allowed to recover the expected profits from a planned but uncompleted effort to raze and rebuild the station. The owner and lessee of the property appeal a grant of partial summary judgment in favor of the DOT.

Construed in favor of the appellant, the evidence shows that Davis Company, Inc. owned two parcels of property on which, in 1974, it built a service station and store. In 1982, Davis leased the property to Walter Alford to operate the station. In addition to being the property owner, Davis originally functioned as a middleman or jobber to Alford by supplying Shell Oil products under what both parties characterized as a "dealer tank wagon" agreement, although the terms of that agreement are unclear. In the late 1990s, Davis began to consider razing and rebuilding the service station and convenience store on the property. Davis also learned in early 1999 that the DOT was interested in widening the adjacent road and that the project could affect the property. In October 1999, retroactive to December 31, 1998, Davis and Alford entered into a new lease agreement and an accompanying product agreement that contemplated a "new upgraded premises," with one rental rate for the station as it then existed and a higher rate once the upgraded facility was completed. But Davis never upgraded the facility, and on or about December 14, 2000, the DOT condemned the property.

The new lease agreement states in a recital that Davis desired to lease the property to Alford "for the purpose of operating a first-class convenience store and fuel dispensing business, . . . subject to [Davis's] right to operate a fuel dispensing business as set forth more fully in the Contract of Sale (Branded) executed concurrently herewith. . . ."[1] Pursuant to the agreement, Davis, among other things, (1) retained the right to enter and inspect the premises, (2) obligated Alford to comply with a list of standards for operating and maintaining the business and the premises, and (3) required Alford to pay all

---

[1] The parties hotly dispute whether the new agreement was ever "put into effect." Construing the facts in favor of Davis, we must conclude that it was. The effective date was either December 31, 1998, or January 1, 1999, and the condemnation occurred on December 14, 2000.

taxes "except those exclusively related to the sale of [Davis's] products. . . ." The lease agreement is subject to the provisions of, and incorporates by reference, the related "Contract of Sale (Branded)" (hereinafter "product agreement").

The related product agreement between the parties provides that Davis agreed to sell and deliver, and Alford agreed to purchase, all of Alford's requirements for "gas, diesel and lubricants." It also provides that title of the product and any risk of loss passed to Alford upon delivery. The price of the product was established at "an average rate of 18.5 cents over Seller's cost ('rack price'), plus all applicable taxes (except sales tax)" until the upgraded facility was completed, at which point the rate would drop to two cents over the rack price plus applicable taxes (except sales tax) and freight rates. The price to be charged was the price in effect "at the time and place of delivery." The product agreement also provides that, after the premises upgrade, Alford would have to remain open for dispensing of product twenty-four hours a day, seven days a week.

Both the lease agreement and the product agreement provide that Alford "is an independent businessman with the exclusive right to direct and control the business operation at the Premises. . . ." Both agreements contain a merger clause.

In January 2000, the DOT moved for partial summary judgment on the grounds that (1) Davis could not recover business losses because it did not operate a business on the property, (2) neither party could recover business losses based on projections of what the upgraded facility might have made in the future because that was too remote and speculative, and (3) Alford could not recover all of his business losses because he failed to mitigate his damages. The trial court granted partial summary judgment and entered final judgment on all these points.

1. A condemnee is entitled to recover just and adequate compensation for the loss of his property. *Bowers v. Fulton County*, 221 Ga. 731, 737 (146 SE2d 884) (1966). A condemnee may recover business losses as a separate item if it operated a business on the property, if the loss is not remote or speculative, and if the property is "unique." Id.; *Dept. of Transp. v. Acree Oil Co.*, 266 Ga. 336-337 (467 SE2d 319) (1996). The trial court's order makes clear that Davis's and Alford's claims for property loss are still pending.[2] This opinion deals strictly with the parties' claim for business losses.

---

[2] "The correct measure of damages for the loss of use of leased property is the diminution in the market value of the leasehold during the remainder of the unexpired term of the lease, less any rents to be paid by the lessee. . . . *McGhee v. Floyd County*, 95 Ga. App. 221, 222 (2) (97 SE2d 529) (1957)." (Emphasis omitted.) *MARTA v. Funk*, 263 Ga. 385, 387 (435 SE2d 196) (1993).

(a) In order to obtain business losses in a condemnation proceeding, the condemnee must first show that it had an established business on the property. *Bowers*, 221 Ga. at 738-739. There is no question that Alford operated a business on the property. Davis contends that the trial court erred by finding that it did not. Davis primarily relies on *Dept. of Transp. v. Morris*, 194 Ga. App. 813 (392 SE2d 291) (1990), and the 1999 contracts, the interpretation of which is a question of law for the court. OCGA § 13-2-1.

*Morris* is distinguishable. In that case, the Morrises owned the land, and Amoco Oil Company leased the property and owned all the improvements including the pumps, storage tanks, and other equipment. 194 Ga. App. at 813. More importantly, Amoco also had an agreement with the dealer for the sale of gasoline on site that provided that Amoco retained ownership of the gasoline until it was pumped into a customer's vehicle. Id. Accordingly, this Court concluded, Amoco's business on site involved more than wholesale-to-retail transactions: Amoco generated profits from its activity *on* the site, not just profits from supplying gasoline to the dealer *at* the site.

In an attempt to show that Davis operated a business on site, the chief executive officer of Davis averred in an affidavit that because it billed Alford based on gasoline sold, Davis "derived a profit from the gasoline only when it was purchased by customers" — a statement apparently copied from *Morris*. See id. But his statement is belied by the agreements upon which Davis relies. The applicable agreements provide that title to the product passed from Davis to Alford upon delivery, that Alford was liable to pay for the product that was delivered, and that Alford held the risk of loss after delivery. Accordingly, although Davis may not have received payment right away, Davis derived a profit at the time of delivery, just like a typical wholesaler or middleman. That the parties agreed to payment terms that allowed Alford to withhold payment until the product was sold to the public is irrelevant to the fact that Davis merely supplied the gasoline and other product items.

The fact that the lease and product agreements contain several provisions granting Davis the right to control aspects of the operation of Alford's station is not controlling. The agreements give Davis the right to inspect and supervise the operation of the "motor fuel dispensing business conducted at the premises" and to verify that Alford was "complying with his contractual obligations . . . , including but not limited to seller's use of any trademark" and certain regulations pertaining to environmental protection and cleanliness. The product agreement also states that these regulations were designed to foster customer acceptance of and desire for Davis's products.

But these provisions simply reflect considerations often required

by suppliers and wholesalers in order to maintain quality and uniformity in their system.

> The rules and regulations within the [lease and product agreements] simply impose various building, construction and/or operational requirements as a means of permitting [the supplier] to achieve a certain level of quality and uniformity within its system. [Cit.] [The supplier] can require results in conformity with the dealer agreements without creating an agency relationship. [Cit.] Moreover, as with the use of distinctive colors and trademark signs, the requirement that a dealer's employees wear uniforms which display a company logo or emblem does not evidence control by [the supplier], but represents no more than notice that [the supplier's] products are being marketed at the station. [Cit.]

*Asbell v. BP Exploration & Oil*, 230 Ga. App. 700, 703 (497 SE2d 260) (1998). These provisions, standing alone, do not show that Davis was operating a business on the site. See generally *Wells v. Vi-Mac, Inc.*, 226 Ga. App. 261-262 (1) (486 SE2d 400) (1997).[3]

Nor is their evidence to support a finding that Davis and Alford were engaged in a joint venture. Both agreements provided that Alford "is an independent businessman with the exclusive right to direct and control the business operation at the Premises. . . ." See *Wells*, 226 Ga. App. at 261-262 (1) (lessor and gasoline supplier not joint venturer with lessee-dealer). See also *BP Exploration & Oil v. Jones*, 252 Ga. App. 824, 829 (1) (c) (558 SE2d 398) (2001) (physical precedent only) (control of cleanliness standards, signs and graphics, lighting, promotional displays, billboards, uniforms, and appearance does not establish that parties engaged in a joint venture where there is no right to mutual control over the conduct of the members of the enterprise).

Although the lease agreement provides that the lessor is liable for taxes "exclusively related to the sale of the Lessor's products," under the facts of this case, this provision is irrelevant to the question of whether Davis operated a business on the property. Under the two agreements, the only sale of Davis's products is the transaction between Davis and Alford, for which Davis may owe taxes. But the only sale arising out of a business operated on the property is the

---

[3] Davis stresses that the product agreement requires Alford to keep his business open all the time. But, that provision of the agreement was only to become effective upon completion of the upgrade, and, therefore, it is not evidence of whether Davis operated a business on the property at the time of the taking.

subsequent sale to the public of Alford's products, because title to the products passed to Alford upon delivery.

Davis's reliance on the recital in the lease agreement regarding its "right to operate a fuel dispensing business" is also without merit. See *McMullan v. Georgia Girl Fashions*, 180 Ga. App. 228, 229-230 (1) (348 SE2d 748) (1986) (we look to the contents of the agreement to determine the character of the relationship created). The agreements show that although Davis was operating a fuel dispensing business, it was not located on the property.

(b) Davis also contends that it is entitled to compensation for the loss of its contract to supply gasoline products to Alford because contracts are property interests covered by the takings clause. See generally *DeKalb County v. United Family Life Ins. Co.*, 235 Ga. 417, 419 (219 SE2d 707) (1975). However, because Davis has not shown that it could not sell its gasoline products elsewhere, it has not shown a compensable loss. See id. at 420-421; *Housing Auth. &c. of Atlanta v. Southern R. Co.*, 245 Ga. 229, 232 (264 SE2d 174) (1980) (must have irrevocably lost something of value that cannot be duplicated elsewhere).

2. The trial court found that the condemnees could not attempt to show business losses based on the planned upgraded business because any such loss was too remote and speculative. See *Dept. of Transp. v. Acree Oil Co.*, 266 Ga. at 336-337. The court also held that "Although . . . evidence of the anticipated profitability of the upgraded convenience store and gas station will generally not be allowed, Condemnees' expert, in giving his opinion of the value of the condemned property, may explain how such evidence was incorporated in his calculations." Following the trial court's ruling, Alford could still pursue his business losses based on the business that existed as of the day of the taking. The trial court also noted that Alford would have to show "uniqueness" at trial.

To be recoverable, business losses must have been caused by the taking. See *Dept. of Transp. v. Arnold*, 243 Ga. App. 15, 18 (1) (530 SE2d 767) (2000). "It is within the sound discretion of the trial court to admit or deny admission of [business loss] evidence when causation of such loss is in question." (Citation omitted.) Id. In this case, the trial court did not err by ruling that evidence of anticipated profits based on a planned-but-not-completed upgraded business was not admissible to show business losses. Those anticipated losses do not result from the government action on the date of the taking. Cf. *City of Marietta v. Edwards*, 271 Ga. 349, 351 (519 SE2d 217) (1999) (with regard to value of real property, city must pay just and adequate compensation for newly renovated property).

The condemnees contend that, like the property itself, the business should be valued based on its highest and best use. See gener-

ally *Dept. of Transp. v. Metts*, 208 Ga. App. 401, 402-403 (1) (430 SE2d 622) (1993); *State Hwy. Dept. v. Thomas*, 106 Ga. App. 849 (1) (128 SE2d 520) (1962). But, application of that principle to business losses would destroy the intent behind the rule that business loss damages cannot be remote and speculative. Without the rule, the owner of an undeveloped city lot could seek, in addition to compensation for the highest and best use of the real estate, business loss damages arising out of a well-developed but unexecuted plan to start a business that was expected to reap large profits.

The cases cited by condemnees in support of their argument that future plans can be considered are all distinguishable in that those cases considered future plans in determining the highest and best use of real property, not determining the business losses associated with a planned-but-incomplete business development. See, e.g., *Clark v. City of Kennesaw*, 237 Ga. App. 42 (514 SE2d 701) (1999); *Flint v. Dept. of Transp.*, 223 Ga. App. 815 (479 SE2d 160) (1996); *Dept. of Transp. v. A. R. C. Security*, 189 Ga. App. 34 (375 SE2d 42) (1988); *Ga. Power Co. v. Cole*, 141 Ga. App. 806, 807 (234 SE2d 382) (1977).

3. The trial court also held that Alford cannot recover all of his business losses because he was required to mitigate his damages yet elected not to continue his business at another location. The court stated that it would allow evidence "as to what Alford could be expected to earn at another business location."

On appeal Alford contends the trial court erred by ruling that Alford's failure to personally investigate possible relocation sites constitutes a failure to mitigate damages such that his business loss claim would be precluded. But we find no such ruling in the trial court's order. The court left the extent to which Alford mitigated damages as a question of fact for the jury. We find no reversible error. Compare *Cobb County v. Crain*, 172 Ga. App. 594 (323 SE2d 890) (1984) (condemnee attempted to relocate repair shop located on condemned property).

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED JULY 3, 2003 — ■■■■■■■■

*Ruffin & Dell, Charles L. Ruffin, Rachel R. Krause*, for appellants.

*Thurbert E. Baker, Attorney General, Chandler & Britt, Luther H. Beck, Jr., Carl E. Lancaster, Jr., Carothers & Mitchell, John H. Zwald*, for appellee.

*Walker, Hulbert, Gray, Byrd & Christy, Michael G. Gray*, amicus curiae.