A04A0945. GARRETT et al. v. WALLACE OIL COMPANY, INC. et al.

(608 SE2d 693)

ADAMS, Judge.

Willie Lee Garrett, individually and as administrator of the estate of Marchello Tyree Garrett, filed a wrongful death action against Wallace Oil Company, Inc. and Viral Patel, asserting claims arising out of the shooting death of his son. Garrett appeals from the trial court's grant of summary judgment to Wallace Oil on Garrett's claims. He also appeals from the trial court's denial of his cross-motion for partial summary judgment on the issue of Wallace Oil's duties and the alleged breach of those duties.

Marchello Garrett was shot to death on the premises of a Texaco gas station located on Flat Shoals Road in Atlanta on February 16, 2000. At the time of his death, Marchello was standing outside an enclosed, converted car wash that was being used for storage at the station. The bullet that killed Marchello was fired from inside the storage building by Patel, one of the owners and the acting manager of the station. Patel was inside the building when he fired, and the bullet traveled through a plywood wall and struck Marchello in the head as he stood outside the wall.

At the time of the incident, Marchello had no weapon on his person, was not under the influence of drugs and alcohol, was not in the possession of any merchandise from the gas station, and had no record of any criminal conviction. Eyewitnesses to the incident stated that Marchello appeared to be urinating or attempting to urinate in a dark area outside the storage building at the time. The station did not have public restrooms.

At some point prior to 1993, Wallace Oil owned the Flat Shoals station, but in 1993, the company and its president, Jim Wallace, sold their interest in the business to Rahim Fires Kapadia. That transaction was memorialized by a deed to secure debt dated December 31, 1993, from Kapadia to Wallace Oil and Wallace. Kapadia later sold the gas station to Baba Investments, Inc., and the deed to secure debt was paid off by Baba Investments prior to the shooting in this case. The record indicates that at the time of the shooting, Baba Investments owned the Flat Shoals station and employed Patel as manager.

At that time, Wallace Oil was a wholesaler of Texaco gasoline under a Wholesale Marketer Agreement with Motiva Enterprises, LLC.[1] Motiva supplied Texaco-branded fuel products to Wallace Oil, which, in turn, provided fuel to Baba Investments for the Flat Shoals station. Wallace Oil had no contract in effect with Baba Investments at the time of the shooting.[2]

Garrett contends, however, that the Wholesale Marketer Agreement between Wallace Oil and Motiva imposes certain duties and rights of control upon Wallace Oil in connection with the Flat Shoals station. He bases his claims against Wallace Oil on these contractual rights and obligations. He asserts that certain provisions of the Wholesale Marketer Agreement effectively vested control over the Flat Shoals station in Wallace Oil, making the company responsible for the training and supervision of the station's personnel.

In granting summary judgment to Wallace Oil, the trial court found that the Wholesale Marketer Agreement did not impose any obligations upon Wallace Oil vis-à-vis either Baba Investments or Garrett, as neither were signatories to that agreement. The trial court also found that Wallace Oil was not vicariously liable to Garrett for any acts or omissions of Baba Investments or its employee, Patel.

1. Garrett contends that the trial court misapplied Georgia law in finding that Wallace Oil was not vicariously liable. He asserts that because the Wholesale Marketer Agreement gave Wallace Oil the right to control the time, manner and operations of the Flat Shoals station, Wallace Oil was vicariously liable to Garrett, whether or not it actually exercised that right. He argues that the test for determining vicarious liability is not whether Wallace Oil actually controlled the operations of the station, but whether it had the right to do so. See *Jordan v. Townsend*, 128 Ga. App. 583, 584 (197 SE2d 482) (1973); *Weiss v. Kling*, 96 Ga. App. 618, 619 (1) (101 SE2d 178) (1957).

---

[1] Wallace Oil actually entered into the Wholesale Marketer Agreement with Star Enterprises, which later assigned its interest in the contract to Motiva.

[2] Wallace Oil and Baba Investments, however, entered into a contract that became effective as of March 1, 2000, approximately two weeks after the shooting.

At the outset, we note that the construction of a contract is generally a question of law for the court, subject to de novo review on appeal. *Coker v. Coker*, 265 Ga. App. 720, 721 (595 SE2d 556) (2004). In support of his vicarious liability argument, Garrett cites to selected language from the Wholesale Marketer Agreement, but that language must be read in context. "The cardinal rule of contract construction is to ascertain the intention of the parties. To this end the whole instrument, together with its circumstances, must be considered." (Citations, punctuation and footnote omitted.) *Nguyen v. Talisman Roswell, LLC*, 262 Ga. App. 480, 482 (585 SE2d 911) (2003). The principal provisions of the Wholesale Marketer Agreement upon which Garrett relies provide:

### 10. *INDEPENDENT STATUS OF PURCHASER*

A. No provision contained in this Agreement shall be construed in such a way as to reserve, give or grant to [Motiva] any right to manage or control the day-to-day business of [Wallace Oil] or any operator of the Retail Facilities. Purchaser and operators of the Retail Facilities have complete control over and sole responsibility for the operation of the Retail Facilities. Neither [Wallace Oil] nor the operators of the Retail Facilities nor its or their employees or agents shall be considered joint venturers, partners, agents or employees of [Motiva] for any reason or for any purpose whatsoever. *[Wallace Oil] and the operators of the Retail Facilities are and shall, at all times be independent business entities that are free* to select their customers; purchase and sell products from sources other than [Motiva]; set their own selling prices and terms of sale; *implement health and safety measures, policies and procedures; and generally conduct their business as they determine* subject to the obligations set forth in this Agreement. [Wallace Oil] and the operators of the Retail Facilities shall at all times remain solely responsible for all aspects of safety and security of the Retail Facilities.

B. [Wallace Oil] and the operators of the Retail Facilities have the sole right to hire, control, supervise and discharge their employees and agents. . . .

* * *

## 11. *SECURITY*

[Wallace Oil] shall operate and maintain and shall require the operators of the Retail Facilities to operate and maintain the Retail Facilities in a secure manner. [Wallace Oil] and the operators of the Retail Facilities shall have and maintain complete control over and sole responsibility for the security of the Retail Facilities. All decisions related to security shall be the sole responsibility of [Wallace Oil] and the operators of the Retail Facilities. All security measures and devices shall be acquired at [Wallace Oil's] or the operator's of Retail Facilities sole discretion and expense and maintained by [Wallace Oil] or the operator of the Retail Facilities.

(Emphasis supplied.)[3]

A full reading of this language makes clear that the intent of the parties was to clarify that Motiva was not undertaking any rights or responsibilities for the operation of the retail operations. Rather, Motiva was looking *jointly* to Wallace Oil and the retail operators to handle those issues. And the agreement explicitly notes that Wallace Oil and the retail operators retain the freedom to conduct their businesses as they determine, including setting their own policies and procedures as to health and safety. In other words, those parties are free to contract and operate their businesses as they choose. This would include the freedom to decide who has control over business operations. The agreement does not purport to designate which entity has control over any retail facility. Thus, contrary to Garrett's contention, nothing in the language of the agreement can be interpreted as vesting the right to control the daily operations of the Flat Shoals station in Wallace Oil.

Accordingly, it was up to Wallace Oil and Baba Investments, the owner of the Flat Shoals station, to designate who controlled its day-to-day operations. No contract existed between those two entities at the time, and there is no other evidence to demonstrate that Baba

---

[3] In addition, Garrett points to provisions of the agreement that require Wallace Oil (1) to attend and participate in certain training programs related to the marketing of Texaco products and related operations; (2) to require that the operators of the retail facilities attend and participate in training programs; and (3) to comply and require that the retail facilities comply with applicable law.

Investments gave control of its operations to Wallace Oil. Wallace testified that Wallace Oil had no ownership, control or responsibility for the operations of the station at the time of the shooting. And the employees of Baba Investments testified that the Flat Shoals station was a family-owned and operated business, and that Wallace Oil did not control its operations.[4] Nor do we find any evidence supporting Garrett's contention that Wallace Oil and Baba Investments operated as a joint venture so as to grant Wallace Oil control over Baba Investments' business operations.

Moreover, we note that Baba Investments was not a signatory to the Wholesale Marketer Agreement. Thus, even if the language of the agreement somehow could be construed as purporting to give Wallace Oil control of the Flat Shoals station, in the absence of some other contractual agreement or evidence of consent, the language would not be binding upon Baba Investments, which owns the station. That company would not be required to hand over the control of its operations just because Wallace Oil and Motiva contracted for such an arrangement.

Thus, there was no evidence that Wallace Oil either had the right or undertook the responsibility for operating the Flat Shoals station. See *BP Exploration & Oil v. Jones*, 252 Ga. App. 824, 826 (1) (b) (558 SE2d 398) (2001). Accordingly, the trial court correctly granted summary judgment on Garrett's claim of vicarious liability.

2. Garrett further argues that the trial court erred in denying his motion for partial summary judgment on the claim that Wallace Oil breached its duties under the Wholesale Marketer Agreement. He asserts that Wallace Oil undertook duties under that agreement to provide for the safety of the facilities and to ensure that the station employees were trained as outlined in the agreement.

Under the Wholesale Marketer Agreement, Wallace Oil undertook certain responsibilities to Motiva in connection with the operation of its wholesale business. We agree with the trial court, however, that any such duties do not extend directly to either Baba Investments or Garrett, who were not parties to the agreement. The trial

---

[4] Although Garrett points to cherry-picked statements by representatives of Texaco and Motiva to support his argument that Wallace Oil operates the Flat Shoals station, we find that those statements do not support Garrett's claim. The deposition testimony of the Texaco representative merely indicates that the company looked to Wallace Oil to deal directly with the gas station, and that Texaco did not deal with the station directly. Motiva's representative simply stated they supplied gasoline to Wallace Oil, who in turn was responsible for providing it to the retail locations they selected. Garrett also cites to a letter received from Motiva's attorney, containing the attorney's hearsay statement that Motiva takes the position that Wallace Oil, not Motiva, is responsible for the Flat Shoals station.

court also found that they could not enforce the agreement as third-party beneficiaries, and Garrett does not contest that holding on appeal.

Rather, he asserts that he was not asserting a third-party beneficiary claim, but instead sought recovery under the rule that a contractor owes a duty not to endanger the public through the negligent performance of a contract, when the consequences of such performance are foreseeable, citing *Moody v. Martin Motor Co.*, 76 Ga. App. 456, 458 (46 SE2d 197) (1948). But a contractor's breach of duty does not make him liable for every occurrence; rather, he is liable only for those that are the probable outcome of such breach:

> The rule well affirmed by the authorities is that under the law a person is required to anticipate or foresee and guard against what usually happens or is likely to happen; but this rule does not require him to anticipate or foresee and provide against that which is unusual and not likely to happen, or in other words, that which is only remotely and slightly probable. The general test in such cases is not whether the injurious result or consequence was possible, but whether it was probable; that is, likely to occur according to the usual experience of persons. A wrongdoer cannot be held responsible [for a consequence which is merely possible] according to occasional experience, but only for a result of consequence which is probable according to the ordinary and usual experience of mankind.

(Citation and punctuation omitted.) *Southern Mills v. Newton*, 91 Ga. App. 738, 740 (1) (87 SE2d 109) (1955). We find that Garrett has failed to present evidence sufficient to raise a jury issue as to whether any alleged breach of Wallace Oil's general obligation to Motiva to require that Baba Investments maintain a secure facility and submit to Motiva's training program was the foreseeable cause of Marchello Garrett's death. The fact that Marchello died on the Flat Shoals station's premises does not a fortiori raise an inference that any action or inaction on the part of Wallace Oil was the proximate cause of the shooting. "An inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility." (Punctuation and footnote omitted.) *R & S Farms v. Butler*, 258 Ga. App. 784, 788-789 (575 SE2d 644) (2002).

*Judgment affirmed. Ruffin, P. J., and Eldridge, J., concur.*

DECIDED DECEMBER 1, 2004 —
RECONSIDERATION DENIED DECEMBER 15, 2004 —

*Conley Griggs, Cale H. Conley,* for appellants.
*Drew, Eckl & Farnham, Paul W. Burke, Steven D. Brower,* for appellees.