A92A1323. WRIGHT et al. v. OSMOSE WOOD PRESERVING, INC.
(426 SE2d 214)

BEASLEY, Judge.

This is an appeal from the grant of summary judgment to one of multiple defendants in a negligence suit. The issues involve the existence vel non of a legal duty, and if one existed, whether the facts regarding breach and proximate cause are in dispute.

The evidence construed in favor of respondent plaintiffs showed the following: On November 12, 1987, Wright was operating a tractor on his neighbor's land. The tractor struck a guy wire attached to a wooden utility pole. It fell and struck Wright in the head, inflicting permanent brain damage.

The pole had been installed by the Washington County Electric Membership Corporation (the EMC) in 1949. It was the policy of the EMC to inspect its poles approximately every ten years. Sometime prior to 1976, the EMC contracted with Osmose Wood Preserving, Inc. to perform these inspections. Apparently, under the terms of that contract, Osmose was to classify the poles it inspected into various categories. We say "apparently" because the parties to the contract were unable to produce a copy, but they agree a written contract was executed.

In a March 1976 inspection, Osmose classified the subject pole as a "reject." Under the system of classification, "reject" pole meant that the pole was deteriorating but did not require *immediate* removal. Classifications of such poles were made on an examination of the degree of rot found in the wood. Osmose's written report on the pole also stated other items of information or recommendation, such as that the effective ground line circumference at the time of inspection was 15 inches as opposed to the original ground line circumference of 30 inches; that the pole was not treated by Osmose at that time; that it was Southern pine and had originally been treated with creosote; and that "yes," the reject pole "can be reinforced." Under "remarks," it was noted that the pole contained decay pockets, inter-

nal sapwood decay, and termites. The report form contained at the bottom of the column labeled "remarks," a printed "Note: Specify 'Dangerous' poles and to whom reported." It was not so specified.

In response to the report, the EMC sent a crew several months later, in September, to replace the pole. The crew did not remove the old pole because Pineland Telephone Company, pursuant to an agreement with the EMC, was also using this pole to hold its own wires. The crew erected a new pole next to it and moved the EMC's wires to the new pole. The foreman reported it as "changed out" on September 13, 1976. To "change out" a "reject" pole meant a transfer of the EMC's equipment to a new pole and the subsequent removal of the old "reject" pole. The EMC crew would not relocate Pineland wires but did cut off the now unneeded top of the old pole above Pineland's wires. Pineland was notified to move its wires so the old pole could be removed. Osmose was responsible for only inspection, treatment when indicated, and reporting. Pole removal was the responsibility of the EMC, which owned the pole, or Pineland.

In 1987, Osmose again, pursuant to the contract, inspected the EMC's poles in the area in which Wright's injury occurred. Although the EMC inspector did not recall inspecting the subject pole specifically, or even encountering any old pole next to a new one, the newer pole bore an Osmose 1987 tag and appeared on the inspection report received by the EMC. The old pole was not listed. The EMC's interpretation of the contract was that Osmose was required to inspect all of the EMC's poles in the area in 1987, including the subject "reject" pole. Osmose's understanding was that it was required to inspect only those poles with EMC wires attached. No party contended that the old pole was actually inspected in 1987.

Wright and his wife sued the EMC, Pineland, Osmose, and four "John Doe" defendants. They alleged that Osmose was negligent in the performance of its duties to inspect, maintain and/or replace the subject pole. The EMC cross-claimed against Pineland and Osmose, and Pineland likewise cross-claimed against the EMC. The EMC's cross-claim against Osmose was later dismissed without prejudice.

Osmose sought summary judgment on the complaint. In opposition, the Wrights submitted, inter alia, an affidavit from an expert who examined the pole remains sometime between November 1989 and January 1991. He stated that they would have contained "less than an inch of sound outer wood in 1976." Thus, the Wrights asserted that the pole should have been properly classified in 1976 as a "danger" pole under criteria agreed upon by the EMC and Osmose. Those criteria, which are not on the report form, included "one inch or less of sound outer wood or equivalent strength remaining." The trial court granted Osmose's motion for summary judgment after concluding that Osmose neither owed nor breached a legal duty to

Wright and that reinspection of the subject pole in 1987 was not part of its contractual duty to the EMC.

The Wrights' five enumerations of error basically represent two contentions: 1) Osmose owed and breached a duty to Wright in 1976, and 2) a factual dispute exists concerning Osmose's 1987 responsibility to reinspect the pole.

1. The Wrights premise Osmose's legal duty on the contract with the EMC and on Restatement 2d Torts § 324A, adopted and quoted in *Huggins v. Aetna Cas. &c. Co.*, 245 Ga. 248, 249 (264 SE2d 191) (1980): " 'Liability to Third Person for Negligent Performance of Undertaking. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered *because of* reliance of the other or the third person upon the undertaking.' " (Emphasis supplied.)

The Wrights rely on (b) and (c), contending that Osmose acquired a duty either by undertaking a portion of a duty the EMC had to maintain its poles in a reasonably safe condition, for which they needed reliable inspections, or because the EMC relied upon Osmose conducting a proper inspection. As the Wrights point out, lack of privity with Osmose is no bar to recovery. See OCGA § 51-1-11 (a).

*Huggins*, supra, involved a negligent safety inspection in which the employee premised a duty towards him upon the employer's reliance on the defendant's inspection of its machinery. The Supreme Court recognized such in the quoted section of the Restatement 2d Torts. See also *Sims v. American Cas. Co.*, 131 Ga. App. 461 (206 SE2d 121) (1974) (an inspector's duty to on-site employees under § 324A); *Robert & Co. v. Rhodes-Haverty Partnership*, 250 Ga. 680 (300 SE2d 503) (1983) (a building inspector's duty to purchasers of a building who relied upon the report). A common element in these cases is foreseeability.

Reliance upon an inspection need not be by the injured party. See *Huggins*, supra, and § 324A. The fact that Wright knew nothing of the inspection and placed no reliance on it does not bar recovery under § 324A (c) if it can be shown that the EMC's reliance on an improper inspection caused the injury. However, the uncontroverted evidence precludes this.

Assuming that the pole should have been reported as "Dangerous" in 1976, which is in dispute, there is no evidence of record from which a jury could deduce that such a classification would have produced different action by the EMC so as to prevent Wright's injury.

It was classified as rejected and it was made plain to the EMC that the pole was in a rotted and progressively deteriorating state with termites, requiring removal. The EMC understood this as evidenced by the fact that approximately six months later, the EMC sent workers out to move the wires onto a new pole and remove the "reject" pole. The fact that the pole was not removed was not because of any misunderstanding about the pole's condition or what should be done but because of the attachment of the telephone company's wires. The record is silent as to why the telephone company did not transfer its wires to the replacement pole. Although it was reasonably foreseeable that the EMC would rely on the report for its continued use or removal of its poles, it was not reasonably foreseeable that the EMC would not remove or reinforce the "reject" pole at all despite it not being reported as "dangerous." The EMC's claimed reliance on an allegedly improper inspection for its nonremoval of the pole cannot be found to have caused Wright's injury, which occurred more than 11 years later, so as to place the case within § 324A (c).

Alternatively, under the EMC's interpretation of its contract with Osmose, the Wrights contend that § 324A (b) applies because the agreement was to ensure that the EMC was maintaining safe and useable poles, and Osmose had therefore assumed part of the EMC's general duty to the public when it undertook to inspect, treat, and report. Illustration number 2 of § 324A is: "The A Telephone Company employs B to inspect its telephone poles. B negligently inspects and approves a pole adjoining the public highway. Because of its defective condition the pole falls upon and injures a traveler upon the highway. B is subject to liability to the traveler." *Universal Underwriters Ins. Co. v. Smith*, 253 Ga. 588, 590-591 (322 SE2d 269) (1984), uses an illustration of § 324A in its analysis.

Osmose's objection to the use of § 324A and Illustration 2 in this case is that the predicate is not met because Osmose did not "fail to use reasonable care" or "negligently inspect," i.e., did not breach its duty. That is in factual dispute because of the Wrights' evidence that the pole may have been misclassified in 1976. However, such dispute is not material to the question of Osmose's liability, again because of foreseeability.

"In order for a party to be liable as for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient, if in ordinary prudence he might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might result. (Cits.)' [Cit.]" *Storer Communications v. Burns*, 195 Ga. App. 230, 231 (393 SE2d 92) (1990). Osmose could not have reasonably foreseen that the EMC would not follow through on Osmose's recommendation of removal or reinforcement so as to lead, ultimately, to

injury.

2. Whether or not Osmose was contractually required to reinspect the subject pole in 1987 is likewise not material to the question of Osmose's liability because its original classification of the pole, even if found to be erroneous in alerting the EMC to the proper degree of urgency, required the pole's removal or reinforcement long before 11 years had passed and the pole fell. See Division 1, supra.

"[Summary judgment] cannot deprive a party of the opportunity to have a trial of a genuine issue as to any material fact, and it is indeed a great responsibility to say that 'in truth there is nothing to be tried.' However, a shadowy semblance of an issue is not enough to defeat the motion. . . ." *Holland v. Sanfax Corp.*, 106 Ga. App. 1, 5 (1) (126 SE2d 442) (1962).

The trial court properly granted summary judgment to Osmose on the Wrights' claim.

*Judgment affirmed. Andrews, J., concurs. Birdsong, P. J., concurs in the judgment only.*

DECIDED NOVEMBER 24, 1992 —
RECONSIDERATION DENIED DECEMBER 9, 1992 

*Gainer & Waldrop, William G. Gainer, Knox & Zacks, Gary J. Toman*, for appellants.

*Fortson & White, Michael J. Rust, Swift, Currie, McGhee & Hiers, Guy R. Taylor, Murray & Temple, Greg P. Counts, Webb, Carlock, Copeland, Semler & Stair, Thomas S. Carlock*, for appellee.